**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DEBORAH A. GILLIAM,

                                           CASE NO. 2:18-cv-12793

           *Plaintiff*,                  DISTRICT JUDGE PAUL D. BORMAN

*v.*                                    MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL
SECURITY,

           *Defendant*.

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON**
**CROSS MOTIONS FOR SUMMARY JUDGMENT (R. 10, 11)**

# I. RECOMMENDATION

The Commissioner denied Plaintiff Deborah A. Gilliam's claim for Disabled Widow's Benefits (DWB). *See* 42 U.S.C. § 402(e); 20 C.F.R. § 404.335. For the reasons that follow, I **RECOMMEND DENYING** Plaintiff's Motion for Summary Judgment, (R. 10), **GRANTING** the Commissioner's Motion, (R. 11), and **AFFIRMING** the Commissioner's final decision.

# II. REPORT

## A. Introduction and Procedural History[1]

Gilliam applied for DWB on November 24, 2014, asserting she became disabled on January 1, 2014, (R. 7, PageID.181),[2] but she later amended the onset date to January 20,

---

[1] Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, (R. 2), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for DWB.

[2] The administrative law judge's decision and the Commissioner's brief give September 29, 2014, as the application date. (R. 7, PageID.40; R. 11, PageID.1582.) Curiously, the sheet Gilliam received denying her

1

2016, (*id.*, PageID.194.) The claim was initially denied. (*Id.*, PageID.120.) She then sought and received a hearing before an administrative law judge (ALJ), which occurred on April 18, 2017. (*Id.*, PageID.53-104.) In a decision dated June 1, 2017, the ALJ found Gilliam was not disabled. (*Id.*, PageID.40-48.) When the Appeals Council subsequently denied her request for review, the ALJ's findings became the final decision subject to judicial review. (*Id.*, PageID.26-28.) Then came this lawsuit and the cross-motions for summary judgment. (R. 1, 10, 11.) The briefing is complete and the case is ready for resolution.

### B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker*

---

claim at the initial level displays the same September date. (R. 7, PageID.120.) But the date I cite above comes from the actual application, and it is the one Gilliam uses here. (R. 10, PageID.1561.) Either way, the application date is immaterial to the issues before the Court.

*v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C.  Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

In addition to proving disability as defined above, a widow seeking to qualify for

4

DWB must also show that (1) she is the widow of a wage earner who died fully insured, (2) she is at least 50 years old but not yet 60 (if the claimant is 60 or over, different rules apply), and (3) her disability began before the prescribed period ended. 42 U.S.C. § 402(e); 20 C.F.R. § 404.355; *Foster v. Comm'r of Soc. Sec.*, No. 15-11133, 2016 WL 8114193, at *2 (E.D. Mich. April 6, 2016), *rep. & rec. adopted by* 2016 WL 4072475 (E.D. Mich. Aug. 1, 2016). None of these requirements is at issue here.

### D.  ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Gilliam was not disabled. (R. 7, at PageID.48.) At step one, the ALJ found that Gilliam met all the non-disability requirements for DWB benefits and had not engaged in substantial gainful employment since her amended onset date. (*Id.*, PageID.42.) At step two, the ALJ concluded that Gilliam had the following severe impairments: "left ankle fracture status post ORIF; depression; anxiety; posttraumatic stress disorder (PTSD); osteoarthritis; and substance abuse." (*Id.*) At step three, the ALJ found that these impairments did not meet or medically equal the severity of a listed impairment. (*Id.*, at PageID.43-44.)

Before proceeding to the final steps, the ALJ found that Gilliam could perform light-exertional work as defined in 20 C.F.R. § 404.1567(b), with a few additional restrictions: "she needs a sit/stand option at will; can frequently push/pull with her left leg; occasionally climb, stoop, kneel, crouch, and crawl; frequently balance; in simple, routine, repetitive work; with occasional public interaction." (*Id.*, PageID.44-45.) At step four, the ALJ found that Gilliam had no past relevant work. (*Id.*, at PageID.46.) Finally, at step five, the ALJ determined that Gilliam could perform a significant number of jobs in the national

economy. (*Id.*, PageID.47.)

### E. Administrative Record

#### 1. Overview of the Medical Evidence

I have reviewed the entire administrative record, which lumbers to over 1500 pages. Because Gilliam's arguments target two narrow aspects of the ALJ's decision, I will not recount the medical evidence here but instead discuss it as necessary in the analysis that follows.

#### 2. Application Reports

In her undated disability report, Gilliam listed a host of conditions that limited her ability to work: in addition to those mentioned in the ALJ's decision (noted above), she claimed to have bipolar disorder, headaches, swelling, hypothyroidism, hypertension, Factor V Leiden, rheumatoid arthritis, and "joint/[k]nee/hip/ankle pain." (R. 7, PageID.200.) Elaborating, she explained that she could not "stand, lift, bend, walk for any length or even sit for extended periods without moving around and lying down. . . . I feel so weak and simple things wear me out." (*Id.*, PageID.208.)

She stopped working in August 2009 due to both her mental and physical states. (*Id.*, PageID.201-02.) At that last job, she was a safety monitor for a roofing company. (*Id.*, PageID.202.) The position required her to lift up to 50 pounds and frequently (*i.e.*, up to two-thirds of the workday) lift 30, as well as stoop, kneel, crouch, stand, and walk for hours each day. (*Id.*) Before that job, she had not worked for 15 years. (*Id.*)

Gilliam completed an Adult Function Form in January 2015. (*Id.*, PageID.229, 236.) In it, she recounted a long history of mental illness stemming from childhood abuse. (*Id.*)

6

As recently as January 2014, she "was hospitalized for another suicide attempt." (*Id.*) She again noted her chronic physical ailments, which exacerbated her depression and anxiety, as well as her need to lie down throughout the day and the severe pain she experienced. (*Id.*) Finding a comfortable sleep position was difficult due to her pain, and so she often was poorly rested. (*Id.*, PageID.230.) Her pain also slowed down her personal care routine, which she ignored altogether when she was depressed. (*Id.*) Cooking, too, took time and was limited to simple fare like sandwiches; her inability to lift, along with her general pain, prevented her from preparing complete meals. (*Id.*, PageID.231.) For these same reasons, others had to take care of household and outdoor chores. (*Id.*, PageID.231-32.) She could drive short distances and also ride in a car, and she could get around alone but preferred company. (*Id.*, PageID.232.)[3] Handling finances was difficult, and she required assistance. (*Id.*) She had no hobbies and her social life suffered during bouts of depression or anxiety. (*Id.*, PageID.233.)

Gilliam's conditions affected almost every "ability" related to work, including lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, remembering, understanding, and using her hands. (*Id.*, PageID.234.) More particularly, her ability to walk varied, and she used a cane when needed; she also struggled to follow conversations and handled stress poorly. (*Id.*, PageID.234-35.)

Gilliam's friend, Cynthia Wyatt, filled out a Function Report on behalf of the application for benefits. (*Id.*, PageID.209-16.) The responses are largely identical to

---

[3] Later, at the hearing, she would testify that she had given up driving. (*Id.*, PageID.90.)

Gilliam's.

### 3. Administrative Hearing

At the hearing, Plaintiff explained that her education ended with the ninth grade, when she became pregnant, got married, and later had more children. (R. 7, PageID.63-64, 94.) During that period, she was "able to work and raise a family." (*Id.*, PageID.94.) She last worked in 2010 at a flower shop, making floral arrangements, but her pain made it impossible to continue. (*Id.*, PageID.87.)

Gilliam also testified she lived with a friend who had brain damage but, according to Gilliam's attorney, was able to take care of her after her husband committed suicide. (*Id.*, PageID.60-61.) Sometimes, though not often, Gilliam cooked for the two of them. (*Id.*, PageID.62.) Yet another friend would help Gilliam with cleaning the house. (*Id.*, PageID.63.) On a few occasions, Gilliam had been hospitalized for psychiatric conditions, most recently in 2014 after a suicide attempt. (*Id.*, PageID.64-65.)

Since January 2014, she had not looked for work. (*Id.*, PageID.68.) "I have trouble with sitting for long periods," she explained, adding that her legs cramped when sat due to her history of blood clots. (*Id.*) When asked, however, she acknowledged she did not currently have a blood clot. (*Id.*) The first and only clot, or embolism, occurred around 2010. (*Id.*, PageID.83.) The blood thinning medications she took to treat the condition posed their own risks, such as excessive bleeding. (*Id.*, PageID.83-84.) The only way to work out the cramps was to walk, which in turn caused muscle soreness. (*Id.*, PageID.82.) When she sat her legs needed to be elevated. (*Id.*)

Even if an employer would let her sit or stand as she liked, constant pain would

prevent her from working. (*Id.*, PageID.69.) In particular, she had broken her ankle at some point, leading to ongoing problems; this would explain why she could not work even with a sit-stand option. (*Id.*, PageID.74, 86-87.) Although "good days" were possible, different pains popped up frequently, such as in her legs or with arthritis, or she could be waylaid by medication side effects (generally fatigue and sometimes headaches) or depression. (*Id.*, PageID.88-89, 95.) And "mentally," Gilliam explained, she was incapable of interacting with the public. (*Id.*, PageID.70.) Indeed, anxiety attacks forced her to lie down a few times each week. (*Id.*, PageID.89.)

A chunk of the hearing was spent discussing Gilliam's past alcohol and substance abuse problems, which worsened after her husband's death. (*Id.*, PageID.70-73, 92.) But she testified that programing she attended had helped, and she no longer drank or used drugs. (*Id.*)

The ALJ then asked the vocational expert (VE) to

> assume a person of claimant's age, education, and work experience, who is able to do light work as it's defined by the regulations, but who requires a sit/stand option at will; can only frequently push or pull with the left leg; can only occasionally climb, stoop, kneel, crouch, crawl; can only frequently balance; in simple routine, repetitive work, with only occasional public interaction.

(*Id.*, PageID.80-81.) Could such a person perform jobs in the national economy? Yes, the VE responded: a collator operator (50,000 positions nationally), a mail sorter clerk (46,000 positions), and a small products assembler (150,000 positions). (*Id.*, PageID.81.)

**F.  Law and Analysis**

Gilliam makes two arguments: (1) the ALJ failed to explain the weight he accorded

to a doctor's opinion on Gilliam's ability to lift "*less than* 20 pounds," and (2) the ALJ considered Gilliam's credibility, contravening the recently issued Social Security Ruling (SSR) 16-3p, 2016 WL 1119029 (Mar. 16, 2016). (R. 10, PageID.1572, 1575.) Each contention will be addressed in turn.

### 1.  Exertional Limitations

Gilliam's first argument focuses on the opinion of Dr. R. Scott Lazzara that she could lift "less than" 20 pounds. (R. 7, PageID.361.) This conclusion came after an examination of Gilliam in April 2015. Notes from the physical examination did not reveal any findings suggesting impaired arm or hand strength. "There is no evidence of joint laxity, crepitance, or effusion," Gilliam's "[g]rip strength remains intact," her "[d]exterity is unimpaired," her "[m]otor strength is intact," and her "[m]uscle tone is normal." (*Id.*, PageID.364, 366.) In the section for his conclusions, Dr. Lazzara said nothing about Gilliam's upper-body strength, focusing instead on hip and ankle pain, Factor V Leiden, and depression, which he thought represented her "main issue." (*Id.*, PageID.366.)

The disputed notation concerning Gilliam's strength does not appear in the main report; instead, it shows up in a supplemental form providing more specific measures of physical capabilities. (*Id.*, PageID.361-62.) Aside from some troubles bending, stooping, squatting, and with her gait, the supplemental report reveals no abnormalities. The relevant opinion on her carrying, pushing, and pulling ability is a handwritten symbol, "< 20." (*Id.*, PageID.361.) The only other mention of lifting abilities appears to come from Gilliam. In the section containing her statements, the examination form states, "She can lift 20 pounds." (*Id.*)

Gilliam seeks to leverage a slight disjunction between the RFC and Dr. Lazzara's opinion. The ALJ accorded Dr. Lazzara's opinion "great weight" because it was "generally consistent with the record as a whole." (*Id.*, PageID.46.) Yet, according to Gilliam, this medical opinion is inconsistent with the RFC, a fact that the ALJ failed to address. (R. 10, PageID.1570.) Specifically, Dr. Lazzara's finding that Gilliam could carry, push, and pull less than 20 pounds clashes with the "light work" exertional standard in the RFC. That standard is defined in 20 C.F.R. § 404.1567(b) as the ability to "lift[] no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." Likewise, the Dictionary of Occupational Titles (DOT) defines light work as "[e]xerting up to 20 pounds of force occasionally [*i.e.*, up to one-third of the workday], and/or up to 10 pounds of force frequently [*i.e.*, up to two-thirds of the workday]." DOT, App. C, § IV, 1991 WL 688702 (1991). Thus, the RFC requires Gilliam to lift 20 pounds, but Dr. Lazzara found she could lift less than 20 pounds.

It is a subtle distinction, but one of vast importance, Gilliam claims. (R. 10, PageID.1573-74.) The reason is that Dr. Lazzara's limitations are more consistent with the sedentary-exertional level, which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). If she matched the sedentary level, then the Medical Guidelines would mandate a finding of disability based on her age, education, previous work experience, and exertional capacity. (R. 10, PageID.1574.); *see* 20 C.F.R. pt. 404, Subpt. P, Appx 2, § 201.09 (2019) (prescribing a finding of disability if the claimant is "[c]losely approaching advanced age," has "[l]imited or less" education, and has "[u]nskilled or past

11

work experience). In any case, Gilliam continues, the ALJ did not evaluate the medical opinion under the proper framework. (R. 10, PageID.1572-73.)

The issue is whether the ALJ appropriately evaluated Dr. Lazzara's opinion. Under the regulations applicable to Gilliam's claim,[4] a medical opinion is a statement from a physician like Dr. Lazzara regarding "the nature and severity of [the claimant's impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite the impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). The ALJ must use a six-factor balancing test to determine the probative value of these medical opinions. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c).

Here, I find Gilliam's argument unpersuasive. As an initial matter, the difference between 20 pounds and "less than" 20 pounds is vanishingly thin. Gilliam asserts that "less than" 20 "would *also* encompass, say, 15 pounds, and it's quite possible this is more in line with what Dr. Lazzara had meant when he included these restrictions." (R. 12, PageID.1594.) This is inaccurate: the "<" symbol contains all numbers under 20; this

---

[4] Various amendments have occurred after the claim was filed. *See, e.g.*, *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulation here, however, expressly applies to claims filed before March 27, 2017. *See* 20 C.F.R. § 404.1527.

includes everything from 1 pound to 19.$\overline{99}$ pounds. It represents, in other words, every number under 20, no matter by how much. In mathematics, this is dubbed an "unbounded interval," extending indefinitely to the left of (*i.e.*, less than) 20. J.S. Ratti & Marcus McWaters, *College Algebra and Trigonometry*, 7 (3d ed. 2015). Dr. Lazzara must have meant to suggest such an interval (although not one dipping into negative poundage): he could not have intended to say that Gilliam could lift a specific poundage, *e.g.*, 15, but not 14, 16, or any other. If had wanted to convey the conclusion that she could lift 15 pounds, he could have easily said so. He did not. To speculate that he had some other number in mind ignores what he wrote.[5]

Caselaw supports the conclusion that "less than" 20 pounds is not meaningfully different from 20 pounds. The Seventh Circuit has concluded that arguments like Gilliam's "border on the frivolous." *Coleman v. Astrue*, 269 F. App'x 596, 601 (7th Cir. 2008). There the plaintiff "contend[ed] that the ALJ's RFC assessment should have limited [him] to lifting 'less than' ten pounds rather than lifting 'up to' ten pounds." *Id.* The court rejected this reasoning because by concluding "that Coleman could lift 'up to' ten pounds, the ALJ

---

[5] The Commissioner points out that the report contains no explanation for this limitation other than the statement apparently by Gilliam that she could "lift 20 pounds." (R. 11, PageID.1585 (quoting R. 7, PageID.363).) From that perspective, he chose 20 pounds purposefully and likely bumbled articulating it by not writing "$\leq 20$" to signify "less than or equal to 20." But as Gilliam correctly observes, this reading of the evidence was not offered by the ALJ below and therefore cannot be accepted by the Court now. (R. 12, PageID.1594); *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *7 (6th Cir.1993) (unpublished decision) ("[I]n large part, an agency's decision must be affirmed on the grounds noted in the decision."). Still, the statement in the report provides independent evidence of Gilliam's abilities. To the extent Gilliam means to argue that any rationalization is necessarily *post-hoc*, and thus impermissible, I disagree. As discussed above and below, Dr. Lazzara's opinion is not meaningfully different from the conclusion that Gilliam can lift 20 pounds. Consequently, while a better decision would have addressed this slight distinction, the ALJ was not obliged to do so.

incorporated Dr. Elmes's opinion that Coleman had a lifting or carrying limitation of 'less than' ten pounds. It is difficult to find a meaningful distinction between these terms that could be taken as a rejection of Dr. Elmes's opinion." *Id.*

Gilliam rightly notes that *Coleman* has not often, or even ever, been cited to address similar facts. (R. 12, PageID.1593.) But other cases have reached the same conclusion. One held that "the distinction drawn by plaintiff based on whether he could lift 'up to'" 20 pounds (as the ALJ stated in his hypothetical to the VE) "or 'less than' 20 pounds" (as a doctor had concluded), "is, in the court's view, without a difference." *Terreri v. Astrue*, No. 07–CV–277–JTC, 2009 WL 749860, at *6 (W.D.N.Y. Mar. 18, 2009). Under slightly different facts, this Court has also rejected the notion that the ability to lift "less than" a certain weight is meaningfully different from the ability to lift "up to" that weight. In *Gareau v. Commissioner of Social Security*, the plaintiff argued that the ALJ mischaracterized a doctor's opinion that he could lift "less than" 30 pounds as stating he could lift "up to" 30 pounds. No. 08-12047, 2010 WL 733030, at *11 (E.D. Mich. Feb. 26, 2010). Though the argument was irrelevant because the RFC was limited to lifting no more than 10 pounds, the Court nonetheless noted that "[t]here is no significant difference between the ALJ's finding and [the doctor's] opinion." *Id.*

Gilliam relies on a distinguishable case, *Rogers-Lee v. Comm'r of Soc. Sec.*, No. 2:14–cv–11415, 2015 WL 5162269 (E.D. Mich. July 21, 2015), *rep. & rec. adopted by*, 2015 WL 5159750 (E.D. Mich. Sept. 2, 2015). There, the gap between the RFC and the medical opinion, to which the ALJ accorded "great weight," was a full 5 pounds: the opinion stated the plaintiff could lift up to 15 pounds, while the RFC established 20 pounds

14

as the maximum. *Id.* Here, the gap is infinitesimal in comparison.

Also, the opinion in *Rogers-Lee* came from a treating physician, whose view was entitled to controlling weight unless the ALJ offered "good reasons" to discount it. *Id.*; 20 C.F.R. § 404.1527(c)(2). Consequently, the ALJ bore a greater burden to justify the findings. The court found the ALJ failed meet this burden. 2015 WL 5162269, at *9. By contrast, here Dr. Lazzara was a consultant who examined Gilliam once, not a treating physician; the ALJ was under no obligation to provide "good reasons" for the weight he accorded the medical. As one court has noted, "Generally, a consultative examiner's medical opinion is entitled to less weight than that of a treating physician." *Bacron v. Comm'r of Soc. Sec.*, No. 2:14-cv-23, 2015 WL 1469150, at *5 (S.D. Ohio Mar. 30, 2015). Opinions of one-time examiners "are not entitled to any special degree of deference," and "an ALJ's failure thoroughly discuss the opinion of a consultative examiner does not warrant reversal." *Id.* Consequently, *Rogers-Lee* is a poor fit for the present case.

To be sure, other courts appear to have found significance in the same distinction Gilliam raises here. In *Estrada v. Berryhill*, the medical source "found that Plaintiff could lift *less than* ten pounds, while the ALJ found that Plaintiff could lift *up to* ten pounds." No. 17-cv-00868, 2018 WL 534302, at *7 (N.D. Cal. Jan. 24, 2018). The court concluded that this difference merited remand. But it offered scant explanation why, and it had already determined that remand was warranted due to other defects. Instead, the analysis merely attempted to distinguish *Terreri*, the only case the Commissioner had cited. The court thought that *Terreri* "did not find that lifting up to twenty pounds and lifting less than twenty pounds was [*sic*] the same thing." *Id.* Rather, *Terreri* "simply found that this

15

distinction did not matter when the ALJ had adequately concluded that the plaintiff could, in fact, lift up to twenty pounds." *Id.*

True, *Terreri* held that "the hypothetical posed to the VE adequately reflected plaintiff's physical limitations," but it did not claim that this conclusion somehow rendered the plaintiff's distinction immaterial. 2009 WL 749860, at *7. It did not hold that the "distinction did not matter" simply because the plaintiff could lift 20 pounds, as *Estrada* asserted. *Terreri* instead independently rejected the distinction the plaintiff drew because it was "without a difference." *Id. Estrada*'s conclusion to the contrary is difficult to understand. Specifically, I cannot see how the ALJ's conclusion in *Terreri* that the plaintiff could lift 20 pounds necessarily meant that evidence he could lift "less than" 20 pounds was a distinction "without a difference." Put differently, it does not follow from the ALJ's conclusion (that the plaintiff could lift 20 pounds) that any other pieces of evidence showing the plaintiff could lift less than 20 pounds were "without a difference"—the ALJ could find the plaintiff capable of lifting 20 pounds while acknowledging that the record contained evidence the plaintiff could lift "less than" that weight. As such, *Terreri*'s upholding of the ALJ's finding would not, without more, render the distinction between 20 pounds and "less than" 20 pounds "without a difference." *Terreri*'s conclusion that no "difference" existed therefore demonstrates that the court actually believed the distinction was immaterial regardless of whether the ALJ correctly established the 20-pound lifting limit.

*Estrada* thus provided no rationale for concluding that the sliver between "less than" 20 pounds and "up to" 20 pounds is meaningful. Other cases suggesting the distinction

matters similarly fail to help Gilliam. One court seemed disinclined to remand on this issue, doing so only because the case was already headed back to the Commissioner on other grounds: the court stated, "Whether [the plaintiff] is limited to lifting *up to* ten pounds or *less than* ten pounds is a small distinction; nevertheless, in an abundance of caution and because the Court is remanding this decision on other grounds, on remand the ALJ should clarify" whether he meant to adopt the medical opinion (*i.e.*, that he could lift "less than" 10 pounds) or something less restrictive. *Berumen*, No. 15-cv-01049, 2016 WL 4091176, at *3 (D. Colo. July 13, 2016). Another court merely noted in passing that the distinction represents "a fine line, but has significant legal ramifications because it sets up a demarcation between light exertional work and work which requires lesser exertional ability, such as sedentary work." *Juarez v. Astrue*, No. CV 10–00435, 2011 WL 488655, at *2 (C.D. Cal. Feb. 9, 2011). While the court highlighted the exertional levels as the basis for potentially finding a meaningful difference, it was not addressing whether the ALJ erred by failing to recognize this distinction; the question was whether the ALJ correctly found that the relevant medical opinion lacked supporting evidence. *Id.*

On the whole, the most persuasive caselaw suggests that the distinction Gilliam raises does not, without more, warrant remand. The cases ostensibly bolstering Gilliam's argument are either distinguishable or do not give reasons to dislodge the commonsense approach outlined in *Coleman*.

Here, in particular, the ALJ's decision contains no factual mistakes regarding this issue. It canvasses Dr. Lazzara's report and correctly repeats the doctor's opinion that Gilliam could "carry, push and pull less than 20 pounds." (R. 7, PageID.43, 46.) The ALJ

never purports to adopt Dr. Lazzara's specific findings, nor was he required to. The regulations merely require ALJs to consider and "weigh" medical opinions. 20 C.F.R. § 404.1527. Still, as in *Coleman*, it is apparent that ALJ "incorporated" Dr. Lazzara's opinion on lifting because there is no "meaningful distinction" between it and the RFC. 269 F. App'x at 601.

Moreover, the ALJ's overall treatment of the opinion satisfied the regulations. As noted above, six factors are used to assess medical opinions. 20 C.F.R. § 404.1527(c). While the ALJ's "explanation . . . must be 'meaningful,'" the "ALJ need not give 'an exhaustive factor-by-factor analysis.'" *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 (S.D. Ohio 2015) (citations omitted). Here, the ALJ's direct analysis of the opinion relied on one of the factors, its consistency "with the record as a whole." (R. 7, PageID.46.) Immediately following this statement, the ALJ illustrated such consistency by noting the medical opinion of a non-examining physician, Dr. Dale Blum, that Gilliam could occasionally lift 20 pounds and frequently lift 10. (R. 7, 46, 115.)

Elsewhere the ALJ makes clear that he considered other factors. Earlier in the decision, for example, he observes that Dr. Lazzara examined Gilliam. (*Id.*, PageID.43.) This relates to the first factor: the examining relationship and the greater weight examiners are generally given compared to non-examiners. 20 C.F.R. § 404.1527(c)(1). And the ALJ's acknowledgement that Dr. Lazzara was an agency medical consultant likewise touched upon the second factor, the treatment relationship, which here did not exist. (R. 7, PageID.43); 20 C.F.R. § 404.1527(c)(2). The ALJ also mentioned Dr. Lazzara's findings, such as Gilliam's left ankle's mildly diminished range of motion and the good effort she

18

made during testing. (R. 7, PageID.43, 46.) These observations at least tacitly address the opinion's supportability—the medical evidence supporting the opinion—which is yet another measure of the opinion prescribed by the regulations. 20 C.F.R. § 404.1527(c)(3).

This analysis arguably leaves two factors untouched: specialization and the catch-all "[o]ther factors" category. 20 C.F.R. § 404.1527(c)(5)-(6). But the ALJ was not required to detail findings factor-by-factor. *Kent*, 142 F. Supp. 3d at 650. In any case, Gilliam does not explain what the ALJ should have done with these factors—or any others—or what evidence he missed with respect to her lifting abilities. If such evidence existed, certainly it would found in the 1500-page administrative record housing medical reports that stretch back two decades before the 2016 alleged onset date. But examinations of her strength almost always produced normal results, and she frequently denied muscle weakness. (R. 7, PageID.303, 306, 309, 312, 314, 317, 348, 354, 523, 527, 530-31, 533-34, 536-37, 540, 543, 546, 549, 552, 557, 735, 767-68, 857, 864, 894, 865-66, 1114, 1121, 1127, 1129-30, 1158, 1476; *see also id.*, PageID.294 (finding normal "[m]otor," "[s]ensory," and "[r]eflexes").) Many physical examinations failed to flag any abnormalities whatsoever. (*Id.*, PageID.592, 595, 598, 601, 604, 770, 773, 868 (except for bilateral calf tenderness), 1132 (except calf tenderness), 1461, 1474, 1486.)

On a few occasions her right arm or shoulder was tender, and she once broke her right hand; but these episodes happened well before the onset date—some from the late 1990s—and there were no accompanying findings of strength deficits. (*Id.*, PageID.1035,

1272, 1390, 1403, 1479, 1508, 1527-28.)[6] The only reports, albeit very old ones, of her lifting objects at work indicated she hauled heavy boxes or bags, in excess of 50 pounds. (*Id.*, PageID.1504-05, 1524.) Finally, as noted above, Dr. Lazzara's report contains a statement that she can lift 20 pounds. (*Id.*, PageID.363.)

In light of this evidence, and Gilliam's failure to cite anything else, I cannot conclude that the ALJ's analysis was either incorrect or that any error was harmful. *Cf. Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (finding harmless error when the ALJ failed to discuss a treating-physician opinion based on evidence pre-dating the onset date). For the same reasons, Gilliam's invocation of the Medical Guidelines as a basis for potential harm is fruitless. (R. 10, PageID.1574.) Other than Dr. Lazzara's opinion, she has not produced any evidence that she belongs in the sedentary exertional category.

### 2. SSR 16-3p

Gilliam's second argument is that the ALJ violated Social Security Ruling (SSR) 16-3p by evaluating her character or truthfulness. (R. 10, PageID.1575-77.) As I will shortly explain in greater depth, SSR 16-3p struck the term "credibility" from the Commissioner's lexicon and admonished ALJs not to judge the claimant's character or truthfulness. 2017 WL 5180304, at *11 (Oct. 25, 2017). Here, Gilliam contends, the ALJ flouted this rule by stating that Gilliam's "poor work history . . . greatly diminishes her

---

[6] Hundreds of pages of records are poorly handwritten. *See, e.g.*, (*Id.*, PageID.1528.) Of course, somewhere in the scrawl might be notes more favorable to Gilliam. But I deciphered most of them, and almost, if not, all these records long precede the onset date.

credibility." (R. 7, PageID.46; R. 10, PageID.1575-76.) "This statement indicates that the ALJ based his overall assessment of Gilliam's symptoms largely on his assessment of her character." (R. 10, PageID.1576.) She continues, "[T]he ALJ here was clearly making a character judgment about Gilliam in light of her employment history, and implying that some other factor, such as laziness, might be at play. There's really no other way to interpret the statement by the ALJ. . . ." (*Id.*, PageID.1577.) She recognizes that the ALJ discussed other proper factors when analyzing her subjective complaints, but she posits that "it's unclear to what extent the ALJ's improper assessment of Gilliam's credibility otherwise impacted his assessment of this case." (*Id.*)

For her part, the Commissioner is willing to "admit that, *in this case*, the ALJ's reliance on plaintiff's past work could be problematic under [SSR] 16-3p." (R. 11, PageID.1586.) But the ALJ's assessment of Gilliam's subjective complaints remains defensible because, according to the Commissioner, any error was harmless thanks to the ALJ's reliance on other, substantial evidence to prop up his finding. (*Id.*)

A two-step inquiry guides an ALJ's evaluation of a claimant's symptoms, which are defined as the claimant's "own description of [his or her] physical or mental impairment," 20 C.F.R. § 404.1502(i). SSR 16-3p, 2017 WL 5180304, at *2. In general, the ALJ must first determine whether an "underlying medically determinable physical or mental impairment(s) . . . could reasonably be expected to produce an individual's symptoms, such as pain." *Id.* at *3. Second, the "intensity and persistence of those symptoms" are examined "to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." *Id.*; *see generally* 20 C.F.R. §

21

404.1529. In the second step, the ALJ considers "all of the available evidence," 20 C.F.R. § 404.1529(a), a promise the regulation repeats again with more specifics: "We will consider all the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons," *id.* § 404.1529(c)(3). Other relevant factors include the claimant's daily activities; the "location, duration, frequency, and intensity of your pain or other symptoms"; treatments and measures used to alleviate the symptoms; "[p]recipitating and aggravating factors"; and the effectiveness of medications. *Id.* § 404.1529(c)(3). Generally, an ALJ's findings on this topic can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

This assessment formerly led to a "credibility" finding. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). But as noted, the Commissioner recently "eliminat[ed] the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." SSR 16-3p, 2017 WL 5180304, at *2. The claimant's "overall character or truthfulness" is not at issue, as it might be in court. *Id.*

The Ruling thus shifts the focus from the claimant's credibility to the consistency of his or her statements with the evidence. *DePrez v. Berryhill*, No. 3:16-cv-02632, 2017 WL 4938228, at *18 (M.D. Tenn. Sept. 20, 2017), *rep. & rec. adopted by* 2017 WL 4918598 (M.D. Tenn. Oct. 31, 2017). But as one can tell from the Ruling itself, SSR 16-

3p did not work a revolution in how subjective complaints, *i.e.*, symptoms, are assessed. The framework remains the regulation, § 404.1529, and that regulation remains the same despite a few amendments in 2017. *Compare* 20 C.F.R. § 404.1529, *with* 20 C.F.R. § 404.1529 (2016).

As such, many courts have recognized that SSR 16-3p changes little of substance and instead tinkers with semantics. *See, e.g.*, *Young v. Berryhill*, No. 3:17-CV-395, 2018 WL 1914732, at *6 (W.D. Ky. April 23, 2018) ("The analysis under SSR 16-3p otherwise is identical to that performed under SSRI 96-7p."); *Sheehan v. Comm'r of Soc. Sec.*, No. 2:16–cv–353, 2017 WL 4231104, at *13 (M.D. Fl. Sept. 25, 2017) ("[W]hile SSR 16–3p eliminates the term "credibility" from the analysis and replaces it with "subjective symptom evaluation," SSR 16–3p does not alter what the ALJ must consider in evaluating a claimant's symptoms."). Prior caselaw consequently remains valid. *Lipayne v. Comm'r of Soc. Sec.*, No. 1:18 CV 273, 2019 WL 1261416, at *8 n. 4 (N.D. Ohio Jan. 29, 2019), *rec. & rep. adopted by* 2019 WL 1396921 (N.D. Ohio Mar. 28, 2019). One court has accordingly groused that the Ruling simply requires "engag[ing] in verbal gymnastics to avoid the term credibility where the usage of the term is most logical," which that court reasonably declined to do. *Pettigrew v. Berryhill*, No. 1:17-cv-01118, 2018 WL 3104229, at *14 n. 14 (N.D. Ohio June 4, 2018). In reality, another court asserted, ALJs "will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016).

The Commissioner's quasi-concession of error and her failure to offer arguments

on the issue means the Court must assume error occurred. *See Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."). But this does not entail the further assumption that the error was slight or grave, pervasive or limited. Hence it remains critical to isolate the alleged error so that it can be weighed alongside the rest of the ALJ's analysis to determine whether the error was harmless.

The logic behind Gilliam's argument appears to be that the ALJ's reliance on her work history implied that she was lazy. She offers no other reasons why the ALJ's particular statement here displays an impermissible credibility finding. Indeed, her brief largely presents the ALJ's statement as speaking for itself. She first notes that it "indicates that the ALJ based his overall assessment on Gilliam's symptoms largely on his assessment of her character." (R. 10, PageID.1576.) Why? She does not say here, leaving the reader to guess that the reason is because reliance on prior work history inherently suggests a character or credibility assessment. In the only other line directly examining the statement, she speculates that the ALJ's statement implied "some other factor, such as laziness, might be at play. There's really no other way to interpret the statement. . . ." (*Id.*, PageID.1577.) But Gilliam gives no other proof from the hearing or decision that the ALJ considered her lazy.[7] Thus, the alleged error is the bare implication of Gilliam's torpidity.

---

[7] In a footnote, Gilliam adds that

the ALJ's line of questioning at the hearing, after Gilliam stated that she wished she could be alone

The error cannot be that the ALJ relied on work history at all. Both before and after SSR 16-3p, work history has been a valid consideration in the ALJ's analysis of subjective complaints.[8] First and foremost, the regulations require as much. As noted above, § 404.1529(c)(3) informs claimants that the Commissioner will consider their "prior work record" when investigating their symptoms. SSR 16-3p reaffirmed this by referencing the factors from § 404.1529(c)(3). *See T.R. v. Berryhill*, No. 17-cv-5587, 2019 WL 1100266,

---

and independent like she was pre-disability, suggests that he was quite focused on the fact that Gilliam never achieved financial independence or lived on her own after getting pregnant in the ninth grade. (Tr. 68-69.) The exchange ends with the ALJ pushing Gilliam to admit that she was "never" independent and alone (Tr. 69). Together with the ALJ's statement regarding Gilliam's credibility in the hearing decision, this exchange further shows how the ALJ negatively viewed Gilliam's lack of work history or financial independence, which apparently was the result of her getting pregnant at a young age and staying home to raise her kids, as she testified to (Id).

(*Id.*, PageID.1577 n. 5.) The dialogue Gilliam refers to occurred after she testified that "[a]s much as I would love to live alone and be independent, like I was, I just don't see that as an option right at this time in my life." (R. 7, PageID.93.) The ALJ then asked when this independent time was, since she had dropped out of school early due to pregnancy. (*Id.*) He had to phrase the question a few ways because it appeared that Gilliam had never lived alone; and he was ultimately correct, as she explained that she considered herself independent (but not alone) in her early years before she became ill. (*Id.*, PageID.93-94.) At the end, the ALJ explained that he "was just curious when you said like I used to be. I was trying to figure out when that was. . . . I don't see any time you were." (*Id.*, PageID.94.)

I disagree with Gilliam's use of this questioning. She cites it as evidence of the ALJ's "negative view[]" of her work history, but the transcript does not support that inference. Rather, it demonstrates he was trying to comprehend Gilliam's testimony. There is as much reason to believe that he hoped she had been independent—thus supporting her disability claim—as there is to believe Gilliam's speculation. Nor does their exchange suggest the ALJ believed she was lazy. As such, the episode does not offer an independent basis for questioning the ALJ's assessment of her subjective complaints, and it does not support her argument that the ALJ's use of her work history evinced his belief in her laziness.

Finally, Gilliam never testified or otherwise informed the ALJ that her poor work history resulted from raising children. Her brief now merely speculates this was the case, stating that "apparently" her lack of a long work record resulted from being a mother. (R. 10, PageID.1577 n. 5.) Thus, the ALJ's analysis did not overlook a proffered explanation for her work history.

[8] Nor could the error be that the ALJ simply used the term "credibility." *See Hargess v. Soc. Sec. Admin.*, 883 F.3d 1302, 1308 n. 3 (11th Cir. 2018) (finding that SSR 16-3p did not apply retroactively, but noting that if it did, the "ALJ's use of the words 'not entirely credible' would not warrant a remand"); *SRP v. Colvin*, No. 15–cv–3006, 2016 WL 4487831, at *6 (C.D. Ill. Aug. 25, 2016) (holding that the ALJ's "use of the term credibility suggests a finding simply that the statements could not be substantiated by the evidence in the record, a determination that is consistent with SSR 16-3p").

at *12 (D. Minn. Mar. 8, 2019) ("SSR 16-3p incorporates the regulations, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), which identify factors to be considered in evaluating the intensity, persistence and functionally-limiting effects of the symptoms, including . . . prior work record . . . ."). Unsurprisingly, the caselaw both before[9] and after[10] SSR 16-3p holds

_____

[9] *See, e.g.*, *Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) ("Just as a good work history may be deemed probative of credibility, poor work history may prove probative as well."); *Jones v. Comm'r of Soc. Sec.*, No. 4:14-cv-14417, 2016 WL 759439, at *2 (E.D. Mich. Feb. 26, 2016) ("The ALJ appropriately considered Plaintiff's work history . . . ."); *Oleary v. Comm'r of Soc. Sec.*, No. 14–10869, 2015 WL 730109, at *7 (E.D. Mich. Feb. 19, 2015) (the ALJ's finding that the plaintiff's "work history reflected a 'minimal attachment to the work force,' as she worked only briefly before starting her family" was an "appropriate consideration"); *Manser v. Comm'r of Soc. Sec.*, No. 2:14-cv-10525, 2015 WL 12682644, at *4 (E.D. Mich. Jan. 26, 2015) ("Social Security regulations specifically authorize ALJs to consider a disability claimant's prior work history and efforts to work when contemplating that claimant's credibility. . . . Although, as Plaintiff argues, a poor work history sometimes may be indicative of an inability to work, it may also be reasonably suggestive of an unwillingness to work."); *Calvert v. Comm'r of Soc. Sec.*, No. 12–15173, 2013 WL 5274374, at *10 (E.D. Mich. Sept. 18, 2013) (upholding the ALJ's credibility analysis because, in part, the ALJ properly noted the plaintiff's poor work history).

[10] *See, e.g.*, *Landers v. Berryhill*, No. 4:17-CV-2830, 2019 WL 1294811, at *4 (E.D. Mo. Mar. 21, 2019) (citing SSR 16-3p and stating that "the claimant's work history" is a factor the Commissioner must consider); *T.R.*, 2019 WL 1100266, at *12 (noting that prior work history remains a proper consideration under SSR 16-3p); *Cervantez v. Berryhill*, No. EDCV 17-2307, 2018 WL 6075790, at *2 (C.D. Cal. Nov. 21, 2018) ("[A] claimant's poor work history remains a relevant factor in weighing testimony, even after the recent Social Security Ruling 16-3p, which eliminated the term "credibility" from the agency's sub-regulatory policy."); *Saltsman v. Berryhill*, No.: 5:17cv168, 2018 WL 4701790, at *10 (N.D. Fla. Sept. 29, 2018) ("Plaintiff deems this statement [from the ALJ that his work history discredited his complaints] an inappropriate examination of Plaintiff's character that runs afoul of SSR 16-3p. The court does not agree. Even assuming that an ALJ's failure to abide by the terms of SSR 16-3p in rendering an opinion would amount to reversible error, the court finds the ALJ's statement in this instance not to expressly raise a matter of credibility but rather to make the point that Plaintiff's work history was inconsistent with his position that he would work were it not for his disability." (footnote omitted)); *Walsh v. Comm'r of Soc. Sec.*, No. 2018 WL 4374237, at *12 (E.D. Mich. Aug. 23, 2018) (discussing SSR 16-3p and holding that the ALJ appropriately considered the claimant's work record, which the plaintiff argued supported his claim); *Teri G. v. Comm'r of Soc. Sec.*, No. 2:17-cv-00050, 2018 WL 4016310, at *4 n. 3 (E.D. Wash. Aug. 22, 2018) ("[T]he ALJ's discussion of Plaintiff's work history falls within a reasonable interpretation of the consistency of Plaintiff's claims versus the other evidence in the record, even under S.S.R. 16-3p."); *Alesia v. Berryhill*, No. 2018 WL 3920534, at *8 (N.D. Ill. Aug. 16, 2018) ("Both SSR 16-3p and its predecessor, SSR 96-7p, refer to a claimant's 'prior work record' and 'efforts to work' as information relevant to evaluating a claimant's symptoms." (footnote omitted)); *Lee v. Berryhill*, No. 16 CV 9806, 2:17-cv-03230, 2018 WL 1115986, at *4-5 (C.D. Cal. Feb. 27, 2018) (applying SSR 16-3p and holding that "[t]he ALJ was entitled to determine from Plaintiff's pre-disability work history (or lack thereof) that he lacked motivation to work."); *Smith v. Berryhill*, No. 2:16-cv-1247, 2017 WL 1502799, at *7 (D. Or. April 26, 2017) (citing SSR 16-3p for the proposition that "[a]n ALJ may consider a claimant's work record when evaluating the credibility of a claimant's symptom testimony"); *Sanders v. Colvin*, No. 2:15-cv-1983, 2016 WL 4247792, at *2, 4 (N.D. Ala. Aug. 11, 2016) (citing SSR 16-3p and holding that the ALJ validly "support[ed] the

that prior work history is a valid consideration—after the Ruling, this factor is used to measure the consistency of the plaintiff's claims with other evidence. It cannot, however, be employed to support a finding that a claimant "is not credible because her sporadic work history indicates that although she could perform work in the past, she was too lazy to do so; ergo, she is not credible now as to the severity of her mental health problems." *O'Ryan v. Berryhill*, No. C17-0689, 2018 WL 1181601, at *4 (W.D. Wash. Mar. 7, 2018).[11]

So here, the ALJ's use of prior work history was proper; the error was in the supposed implication that Gilliam was lazy. The question, then, is whether this implication constitutes reversable error. I conclude it does not. For one thing, it arises solely from the ALJ's use of an otherwise valid factor: Gilliam's work record. No other indications suggest the ALJ was preoccupied with Gilliam's supposed indolence. Thus, the ALJ could consider her work history, but not to determine whether she was lazy; yet, the belief the ALJ made this impermissible determination emerges only by implication. As a result, even though I must assume the ALJ erred, the mistake was modest and does not wholly negate the ALJ's consideration of Gilliam's work history.

---

ALJ's discrediting of [the plaintiff's] subjective complaints"); *cf. Sherrard v. Colvin*, No. 16-cv-02353, 2017 WL 878063, at *9 n. 8 (N.D. Cal. Mar. 6, 2017) ("Prior work history is arguably closer to an impermissible character assessment under SSR 16-3p. . . . However, such a consideration appears to still be valid under 20 C.F.R. § 416.929(c)(3) [and § 404.1529(c)(3)] ('w[e] will consider all of the evidence presented, including information about your prior work record').").

[11] *O'Ryan* does not explain what else about the ALJ's analysis indicated it improperly focused on laziness. Therefore, the case could be read for the proposition that the mere reference of work history is impermissible. But *O'Ryan* makes no such sweeping claim, nor could it in light of the regulations and caselaw mentioned above.

Additionally, the ALJ relied on other valid rationales that Gilliam leaves unchallenged and that render the error harmless. *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) ("[E]ven if an ALJ's adverse credibility determination is based partially on invalid reasons, harmless error analysis applies to the determination, and the ALJ's decision will be upheld as long as substantial evidence remains to support it.").[12] The ALJ appropriately looked to the consistency of Gilliam's claims with the medical and other evidence. (R. 7, PageID.45.) In this regard, he noted the following:

> Claimant testified she has a history of blood clots but had only one embolism in 2010. Claimant testified that she has help with her activities of daily living but on January 26, 2016, stated she was able to complete activities of daily living independently, drive, set up [her] own meds, cook and clean. Claimant stated she was not interested in home care services . . . . Claimant testified she is not capable of dealing with the public but interacted appropriately with examining and treating physicians.

(*Id.*, PageID.45-46.) This analysis was proper and accurate. Daily activities are a required consideration, 20 C.F.R. § 404.1529(c)(3)(i), and the ALJ correctly highlighted an inconsistency in Gilliam's claims. Although she asserted that most daily tasks were

---

[12] *Johnson* supported this proposition by citing *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012), which indeed held that invalid reasons would not require a reversal if the ALJ assembled other substantial evidence. An arguable difference between *Ulman* and the present case relates to the nature of the error. There, the invalid reason was the ALJ's misreading of the date on a medical report, and the court distinguished precedent by noting that the mistake was a factual rather than legal error. *Ulman*, 693 F.3d at 711-12, 714. Here, it could be contended that the error was legal in nature, going to an impermissible basis for judging credibility. But *Ulman* never claimed to confine its holding to factual errors, and *Johnson* thus applied it to errors like the one here. *See Johnson*, 535 F. App'x at 507 (noting that the ALJ erred by discounting the plaintiff's credibility for attending group therapy even though he said he avoided people (the ALJ should not penalize a plaintiff for seeking treatment) and also erred by failing to give the plaintiff an opportunity to explain his decision to forego certain treatments); *see also Meuzelaar v. Comm'r of Soc. Sec.*, 648 F. App'x 582, 585 (6th Cir. 2016) (if the ALJ erred by relying on the plaintiff's conservative treatment to discount her credibility, the error was harmless). As such, *Ulman*'s approach to harmlessness applies here, especially given that the error arises only as an implication from the ALJ's use of a legitimate factor.

impossible for her, (R. 7, PageID.62-63, 231-32), she (or someone who knew her) had recently informed medical personnel that she lived "independently," was uninterested in homecare help, and could complete chores such as "[d]riving, [h]ousework, [l]aundry, [and] [m]eal preparation." (*Id.*, PageID.755; *see also id.*, PageID.447, 763, 809.) Likewise, although she claimed to elevate her legs to avoid blood clotting, she had experienced only one blood clot (an embolism), and that was six years before her alleged disability. (*Id.*, PageID.82-83.)

As for her ability to deal with the public, the ALJ was correct that the medical reports—"evidence submitted by [h]er medical sources" under § 404.1529(c)(3)— routinely note that she was cooperative, attentive, able to interact appropriately, or properly oriented. (*Id.*, PageID.302, 305, 308, 314, 317, 321, 348, 354, 356-57 (attentive, cooperative, and with normal speech flow, but depressed mood and restricted affect); 417, 422, 424, 755, 857, 864, 865, 867 (cooperative but crying), 882, 1035, 1114, 1121, 1127, 1129, 1132, 1158, 1272, 1538.) The major exceptions occurred during the hospitalization after her suicide attempt in January 2014. (*Id.*, PageID.297, 426 (noting poor eye contact, no peer interaction, and isolation), 427 (noting she was withdrawn but also fully participative), 428-29, 432, 444, 461.) Even then, however, she often had no trouble with interpersonal abilities. (I*d.*, PageID.417, 422, 424, 430-31, 463.)

This was not all. In addition to the direct analysis of Gilliam's subjective complaints, the ALJ's decision elsewhere noted that while Gilliam claimed to need a cane "on occasion . . . Dr. Lazzara stated it did not appear required." (*Id.*, PageID.46, 367.) The ALJ also canvassed the relevant medical records, which as noted above failed to support complaints

29

of strength or mobility limitations. (*Id.*, PageID.43, 45-46.) Regarding her interpersonal limitations, the ALJ cited the opinion of Dr. Robert Newhouse, a psychiatric consultant who reviewed Gilliam's records in March 2015. (*Id.*, PageID.46.) Dr. Newhouse concluded that while Gilliam was "[m]oderately limited" in interacting with the public, she had no other significant limitations in social interactions and could complete "simple tasks on a sustained basis." (*Id.*, PageID.117.) This determination further bolsters the ALJ's findings as to Gilliam's subjective complaints.

In sum, these observations add up to substantial evidence that overcomes the error. The ALJ cited evidence relating to multiple factors in § 404.1529(c). The only speck on the analysis is the implication that Gilliam was lazy. But as discussed above, even if this implication rises to the level of error, it is a modest one, especially compared to the evidence favoring the ALJ's finding, which Gilliam does not dispute.

Gilliam's caselaw does not convince me that the error here was harmful. In the first of two cases she cites, *Lockwood v. Colvin*, the court had already decided to reverse the ALJ's credibility findings on other grounds when it finally reached the issue at hand: the ALJ's invocation of the plaintiff's work history. No. 15 C 192, 2016 WL 2622325, at *2-4 (N.D. Ill. May 9, 2016). Unlike the present case, however, the plaintiff had explained why he lacked a lengthy employment record, telling the ALJ that migraines had prevented him from working. *Id.* at *1, 4. The ALJ dismissed the explanation out of hand and concluded that the plaintiff's "current unemployment cannot solely be attributed to his medical conditions." *Id.* at *4. The court rejected this analysis for two reasons: (1) the migraines were not "relevant to the impairments that form the basis for his claims of

30

disability," and therefore the ALJ erred "by not limiting her evaluation to the relevant evidence [of the impairments], as required by the SSR 16-3p"; and (2) that "[b]y rejecting the Plaintiff's explanation for his pre-2008 unemployment simply because she did not believe the Plaintiff to be honest, and then stating that his post-2008 unemployment 'cannot solely be attributed' to his back pain, it appears to this Court that the ALJ was implying that some other factor – laziness, dishonesty, another undisclosed medical condition – was the true reason for Plaintiff's unemployment." *Id.*

*Lockwood*'s rationales are in tension, and the first clearly does not apply here because Gilliam never purported to offer a reason for her former unemployment. The court's assertion that the ALJ was constrained to the evidence regarding relevant impairments came from the following statement in SSR 16-3p, 2017 WL 5180304, at *11: "Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments." But the plaintiff's statement about migraines in *Lockwood* was certainly "relevant to the impairments," as it explained why his work record should not be used against him. What is more, this line from SSR 16-3p comes after one that requires adjudicators to "base their findings solely on the evidence in the case record, including any testimony from the individual ." *Id.*, at *10. So the ALJ was within her rights to take note of the plaintiff's explanation.

Still more confusing is that *Lockwood* criticized the ALJ for mentioning the migraines but considered her rejection of the migraine explanation as evidence the ALJ was evaluating the plaintiff's character. What was the ALJ to do? It seems that the ALJ's

hasty rejection of the explanation could justify the court's decision; perhaps if the ALJ had offered a more robust justification, the court would have reached a different outcome. That view of *Lockwood* would distinguish it from the present matter, where Gilliam offered no excuse for her work history. In any event, the *Lockwood*'s reasoning is hard to parse and I do not find it persuasive.

The second and last case Gilliam cites does not involve the ALJ's use of vocational history. In *SRP v. Colvin*, the ALJ discounted the weight given to medical sources, in part because they "did not have the benefit of . . . *assessing [Plaintiff's] credibility at hearing*," [*sic*]. *SRP v. Colvin*, No. 15–cv–3006, 2016 WL 4487831, at *6 (C.D. Ill. Aug. 25, 2016). To the court, this implied that the ALJ "based her assessment of Plaintiff's symptoms on this assessment [*i.e.*, the plaintiff's performance at the hearing] of Plaintiff's credibility." *Id.* It was this unexplained reference to the plaintiff's credibility that caused the court to reverse. The ALJ's reasoning seemed to suggest that merely watching the plaintiff at the hearing would lead a viewer to question her complaints. Such a rationale, however, has nothing to do with the consistency of those complaints with record evidence, which is what SSR 16-3p requires ALJs to examine. The error in *SRP* was therefore much clearer and more pernicious than the one here, where the ALJ's invocation of a valid factor (Gilliam's work history) perhaps implied an improper character consideration.

For these reasons, I suggest that the ALJ's error was harmless.

### G.    Conclusion

In light of the above, I recommend **DENYING** Plaintiff's Motion, (Doc. 10), **GRANTING** the Commissioner's Motion, (Doc. 11), and **AFFIRMING** the

Commissioner's decision.

## III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc. If the Court determines that any objections are without

merit, it may rule without awaiting the response.

Date:  July 10, 2019                                       S/ PATRICIA T. MORRIS
                                                          Patricia T. Morris
                                                          United States Magistrate Judge

## **CERTIFICATION**

    I hereby certify that the foregoing document was electronically filed this date
through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 10, 2019                                       By s/Kristen Castaneda
                                                          Case Manager